STATE OF CONNECTICUT *v.* WILLIAM MORALES, JR.
(AC 21470)

Mihalakos, Dranginis and Healey, Js.

Argued October 30, 2001—officially released August 27, 2002

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Michael E. O'Hare,* assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, *Susan C. Marks,* supervisory assistant state's attorney, and *Robin Lipsky,* assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, William Morales, Jr., appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[1] On appeal, the defendant contends that he

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

is entitled to a new trial because the trial court improperly (1) permitted the state, during jury selection, to exercise its peremptory challenges in a racially discriminatory manner as to two minority venirepersons, (2) failed to dismiss the selected jurors and the remaining venire, and begin anew the jury selection process after it found a *Batson*[2] violation as to a third minority venireperson, (3) refused to charge the jury on intoxication, (4) refused to charge the jury on "the sole theory of defense" and that, coupled with the court's "partisan bolstering of the state's case, separately and together, denied [him] a fair trial," and (5) instructed the jury on reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In 1993, the defendant's brother, Angel Resto, and the victim, Andrew J. Scott,[3] were associated in a narcotics distribution business in the Waterbury area. Resto and Scott would obtain large quantities of cocaine, which they processed into crack cocaine at Scott's apartment at 224 Main Street in the Oakville section of Watertown. They then distributed the crack cocaine from the apartment to street level dealers. In 1994, the defendant, who at that time was a seventeen year old student at a Waterbury high school, became involved in the narcotics distribution business operated by Resto and Scott.

In October, 1994, the defendant and Resto heard rumors that when Scott previously had been arrested, he gave the police information concerning the drug dealers with whom he did business to receive more lenient treatment for himself. As a result, they became concerned that if Scott were arrested again, he would

[2] See *Batson* v. *Kentucky*, 476 U.S. 79, 96–98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[3] Scott also was known as Angelo Scagnamiglio.

inform the police of their involvement in the narcotics distribution business. They decided that Scott had to be killed to prevent him from informing on them. Resto offered the defendant $10,000 "to take care of" Scott. The defendant agreed and obtained a .25 caliber semiautomatic pistol and ammunition for that purpose. Thereafter, the defendant and Resto drove by Scott's apartment several times, in effect, surveilling the premises.

On October 17, 1994, Resto drove the defendant to Scott's apartment. The defendant knocked on the door, and Scott let him in. After the defendant entered the apartment, Scott spoke to his two year old daughter in another room. Scott left the child in the other room and joined the defendant in the kitchen. The defendant asked Scott if he could use the bathroom, and Scott said that he could. As the defendant left the room, Scott went to the sink to wash dishes. While Scott's back was turned, the defendant approached him and shot him in the back of his head from about six inches to two feet away. Scott fell to the floor, and the defendant proceeded to fire six more shots at him, emptying the pistol's magazine in the process. The bullet that entered Scott's head lodged beneath his skull, but did not penetrate his brain. Two of the bullets that the defendant fired at Scott as he lay on the floor, however, pierced his aorta, causing death. The defendant fled from the apartment, leaving Scott's daughter alone with her father's bleeding body.

The defendant went to a nearby convenience store and called Resto from a pay telephone, asking him to pick him up. Soon thereafter, Resto arrived at the store. The defendant entered Resto's vehicle and told him that he had killed Scott. After he returned to Waterbury, the defendant threw the pistol that he used to kill Scott in a dumpster near his home on Austin Road.

On October 18, 1994, the day after the shooting, Mary Ann Kellas, the assistant director of the day care center that Scott's daughter attended, called Scott's apartment to inquire why the child had not come to the center for two days. When no one answered her call, Kellas and Elizabeth Byrd, an employee of the day care center, went to Scott's apartment to determine if there was a problem with the child. They arrived at the apartment at around noon and, as they stood at the door, they heard Scott's daughter crying inside. They called to her and asked her to open the door. When the child opened the door, she was dressed only in a dirty diaper and was covered with feces and blood. She also was crying and saying, "My daddy, my daddy." From their vantage point at the door, Kellas and Byrd could see Scott lying on his back on the kitchen floor in a pool of blood. The two women took the child out of the apartment and asked a neighbor to call the police.

At about 12:45 p.m., Officer Roseanne Sabol of the Watertown police department was dispatched to the scene. When she arrived, she observed Kellas and Byrd at the apartment door trying to keep Scott's daughter, who was hysterical, from going back inside. Sabol entered the apartment, checked Scott's body and determined that he was dead. She noted that the kitchen faucet was running and that a stove burner was on and glowing red. Sabol then secured the crime scene and called the detective bureau.[4]

Detectives from the Connecticut state police major crime squad and the Watertown police department arrived at the scene to investigate the homicide and collect evidence. Sergeant David Wagner of the state police collected seven .25 caliber cartridge casings from the kitchen. He also discovered in the apartment a number of items that indicated that Scott was involved in

---

[4] Apparently, Sabol also called an ambulance for Scott's daughter.

narcotics distribution.[5] Sergeant Ronald Blanchard of the Watertown police department found an address book that included an entry under the name "Angel." The telephone number listed by that name was for a pager owned by Resto.

The United States Customs Service provided Blanchard with information that Resto and Scott had been involved with each other in drug trafficking. With that information, Blanchard obtained a search warrant for Resto's apartment at 103 Walnut Street in Naugatuck. During his search of the apartment, Blanchard seized sixteen .25 caliber cartridges, which were subsequently matched with the cartridge casings recovered from Scott's apartment.[6] After obtaining that evidence, Blanchard contacted Sergeant Neil O'Leary, a detective with the Waterbury police department, requesting his assistance in trying to locate Resto. They were unable, however, to locate Resto at that time.

In early December, 1994, the defendant made a telephone call to his friend, Mouzbon Maksuti,[7] and told her that the police had searched Resto's apartment. He also told her that there was more to the story and that he wanted to speak to her about it in person. They agreed to meet that evening at a doughnut shop where Maksuti worked. That evening at the doughnut shop, the defendant made Maksuti promise that she would not tell anyone what he was about to tell her. He then told her that Resto had paid him $10,000 to kill "a Watertown guy" because he was a "snitch." The defen-

---

[5] For instance, Wagner found two pagers, four plastic containers that held large amounts of suspected cocaine and a gallon container of acetone, a chemical used for processing powder cocaine into crack. Also, other detectives found $20,000 in Scott's car.

[6] A comparison of the tool marks on those cartridges and the tool marks on the cartridge casings recovered from Scott's apartment revealed that the cartridges and casings had been ejected from the same firearm.

[7] Maksuti also is known as "Bonnie."

dant also described the manner in which he committed the murder, telling Maksuti that he approached the victim from behind as he was washing dishes and shot him six or seven times. He stated that after he shot the victim, he looked into his eyes and then ran out of the apartment, went into a wooded area and vomited. The defendant also told Maksuti that he keeps seeing the victim's eyes and "all the blood" and that he could not sleep.

A few months later, the defendant met with Maksuti again and told her that if he had known how he would feel, "he would never have killed the guy." After the defendant confided in Maksuti about the killing, she wrote him several letters in which she discussed their relationship. In one of those letters, she alluded to the defendant's admission that he had killed a man in Watertown.

In 1995, O'Leary was assigned to the statewide narcotics task force, which was investigating drug trafficking in Waterbury. In December, 1995, while O'Leary was conducting the surveillance of a residence at 106 Hillhouse Road in Waterbury, he recognized Resto, who was participating in the drug trafficking at that location. On February 14, 1996, investigators from the task force executed search warrants at 106 Hillhouse Road and at Resto's residence on Mulloy Road in Waterbury. Later that day, Resto was arrested on the basis of the evidence seized during those searches.

In addition, at approximately 5:30 p.m., the defendant and some other persons suspected of trafficking narcotics were brought to the Waterbury police station for questioning. At the station, O'Leary advised the defendant of his constitutional rights and questioned him about his involvement in drug trafficking as well as the Scott homicide. The defendant consistently denied any knowledge of Scott's murder. During the questioning,

however, the defendant acknowledged that he owned a .25 caliber pistol and gave the police permission to search for it in his apartment. The police subsequently searched the apartment and discovered a pistol. An examination of the firearm disclosed, however, that it was not the pistol that was used to kill Scott. The defendant left the police station at approximately midnight and returned home.

During their search of 106 Hillhouse Road, the police discovered one of letters that Maksuti had written to the defendant.[8] That letter indicated that Maksuti had information concerning Scott's murder. On the morning of February 15, 1996, O'Leary, after reading the letter, had Maksuti picked up and brought to the Waterbury police station. When O'Leary questioned Maksuti about the murder, she informed him that the defendant had admitted to her that he killed a man in Watertown. On receiving that information, O'Leary contacted Blanchard and notified him that he was questioning a person who had information about the Scott homicide. O'Leary then had the defendant picked up and brought to the station.

When the defendant arrived at the station, O'Leary again advised him of his constitutional rights and questioned him about Scott's homicide until Blanchard and Detective Thomas Kolatsky of the Watertown police department arrived. After their arrival, Kolatsky and Sergeant Michael Ricci of the Waterbury police department interviewed Maksuti who told them that the defendant had admitted to her that he killed a man in Watertown. Maksuti then gave the officers a signed and sworn written statement that referred to the defendant's admission.

---

[8] The letter was found among other documents bearing the defendant's name.

After reading Maksuti's statement, Blanchard interviewed the defendant.[9] When Blanchard asked the defendant about his involvement in the Scott homicide, he said, "I did it, I shot him." Blanchard and Kolatsky then brought the defendant to the Watertown police station where he gave a written statement.[10] In his statement, the defendant again admitted that he murdered Scott.[11] When the defendant finished giving his statement, Blanchard printed it and gave it to the defendant to read. After reading it, the defendant indicated that it was accurate and signed the statement. Blanchard then signed the statement as a witness and Kolatsky notarized the statement.

After Blanchard provided the defendant with some food, he told the defendant that he believed that he was holding back some information about the homicide. After thinking about it, the defendant agreed to give another statement.[12] In his second statement, the defendant gave some additional information and implicated

[9] Blanchard first advised the defendant of his constitutional rights by reading from a rights warning card.

[10] In taking the defendant's statement, Blanchard sat at a computer and the defendant sat next to him. Blanchard proceeded to bring up on the computer screen the sworn statement form, which contained a section on the constitutional rights being waived by the person giving the statement. Blanchard advised the defendant of his constitutional rights by reading them from the display on the computer screen. He then typed into the computer the defendant's statement. The defendant read the statement on the computer as it was being typed.

[11] In his statement, the defendant indicated that he was a crack cocaine dealer and that Scott was his supplier. He said that he had decided to kill Scott because some persons had informed him that Scott was a "snitch." He indicated that a friend had driven him to Scott's apartment and that Scott let him in after he knocked at the door. He admitted that he shot Scott in the back as he was washing dishes at his kitchen sink and that he kept shooting him until his pistol was empty. He then stated that he left Scott's apartment and went to a nearby convenience store from which he called a friend for a ride.

[12] Blanchard took the second statement using the same method that he used to take the first statement.

Resto.[13] The defendant signed the statement, and it was notarized by Blanchard's supervisor, Chief Inspector John Gavallas. The defendant was arrested and charged with Scott's murder.

At trial, both Maksuti and the defendant recanted their sworn statements.[14] Nevertheless, the jury convicted the defendant of murder in violation of § 53a-54a.[15] Thereafter, the court sentenced the defendant to a term of fifty-two and one-half years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that he is entitled to a new trial because the court improperly permitted the state, during jury selection, to exercise its peremptory challenges in a racially discriminatory manner as to two minority venirepersons in violation of his state and federal constitutional rights. We disagree.

Before analyzing the defendant's claims with respect to the two challenged venirepersons, we first summa-

[13] In his second statement, the defendant stated that he and Resto were involved in drug trafficking with Scott and that they decided that Scott had to be killed because they were concerned that he would tell the police about their drug activity. He further stated that he and Resto had planned Scott's murder for one week and drove by his apartment several times during their preparation period. The defendant also indicated that on the day he shot Scott, Resto drove him to Scott's apartment and picked him up after shooting.

[14] Although Maksuti acknowledged that she gave the police a statement, she testified that it was not true and that she signed it because the police had threatened to arrest her if she did not cooperate with them.

The defendant testified that the two statements he signed were not true and that he signed them without reading them because the police told him that doing so would "help [him] out." He further testified that he did not kill Scott or even know him.

[15] We note that the defendant's first trial on this same murder charge ended in a mistrial. In that trial, on October 9, 1997, the jury returned a guilty verdict. When the jury was polled, however, one juror could not render a verdict, and the court ordered that deliberations continue. On October 14, 1997, a juror was excused, and the defendant elected not to proceed with a jury of eleven. Accordingly, the court declared a mistrial.

rize the applicable law and standard of review. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986),] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause [of the fourteenth amendment to the United States constitution] forbids the prosecutor to challenge potential jurors solely on account of their race . . . . *State* v. *Robinson*, [237 Conn. 238, 243–44, 676 A.2d 384 (1996)]. . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination.[16] . . . The [party asserting

---

[16] "Under federal law, a three step procedure is followed when a *Batson* violation is claimed: (1) the party objecting to the exercise of the peremptory challenge must establish a prima facie case of discrimination; (2) the party exercising the challenge then must offer a neutral explanation for its use; and (3) the party opposing the peremptory challenge must prove that the challenge was the product of purposeful discrimination. . . . Pursuant to [its] supervisory authority over the administration of justice, [our Supreme Court has] eliminated the requirement, contained in the first step of this process, that the party objecting to the exercise of the peremptory challenge establish a prima facie case of discrimination. . . . Thus, in this state, after the party contesting the use of the peremptory challenge has raised a *Batson* claim, the party exercising the challenge must proffer a race neutral explanation for its decision to strike the venireperson from the jury array. . . . In

the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .[17]

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . . Moreover, [a]lthough the racial composition of the jury impaneled is certainly not dispositive of the issue . . . it is a factor that we must consider in assessing the . . . explanation [of the party who exercises the allegedly unconstitutional peremptory challenge]. . . .

Connecticut, therefore, the party objecting to the exercise of the peremptory challenge satisfies step one of the tripartite process simply by raising the objection." (Citations omitted.) *State* v. *Hodge*, 248 Conn. 207, 219 n.18, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

[17] "Thus, our state jurisprudence differs from *Batson* only in that, under state law, we dispense with the requirement that the defendant make a prima facie showing of discrimination." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 659 n.19, 735 A.2d 267 (1999).

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . . *United States* v. *Alvarado*, [951 F.2d 22, 26 (2d Cir. 1991)]. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. *Hernandez* v. *New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991); *Batson* v. *Kentucky*, supra, 476 U.S. 98 n.21; *United States* v. *Alvarado*, supra, 951 F.2d 25; *State* v. *Gonzalez*, [206 Conn. 391, 395, 538 A.2d 210 (1988)]. Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. *State* v. *Hinton*, [227 Conn. 301, 323–24, 630 A.2d 593 (1993)]; see *State* v. *Gonzalez*, supra, 406–407." (Citations omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 218–24, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). Nonetheless, because of the constitutional implications of the alleged defects in the jury selection process, in reviewing the defendant's claims under the state constitution, we will

subject the findings of the trial court to the same "independent and scrupulous examination of the entire record that we employ in our review of constitutional fact-finding . . . ."[18] (Internal quotation marks omitted.) *State* v. *Ellis*, 232 Conn. 691, 701, 657 A.2d 1099 (1995); see also *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993). We invoke that heightened review, however, "within the broader context of the clearly erroneous standard." *State* v. *Hodge*, supra, 224–25 n.22.

With those principles in mind, we now turn to the defendant's contention that contrary to the court's finding, the state exercised its peremptory challenges in a racially discriminatory manner as to two minority venirepersons. We reject the defendant's claim with respect to both of the challenged venirepersons.

## A

### Venireperson L[19]

After the voir dire of venireperson L, an African-American male, the state exercised a peremptory challenge to strike him from the jury panel. The defendant raised an objection under *Batson*; see footnote 16; and, in accordance therewith, the court instructed the prosecutor to explain her reasons for striking L. The prosecutor stated that she had based her decision on the fact that she found it "unusual" that L, who was a full-time college student, was willing to neglect his studies to serve on a jury.[20] She commented that in questioning

[18] We note that the defendant urged this court to employ a heightened standard of review in our review of the court's findings on his *Batson* claims under the state constitution and that he devoted a great deal of analysis to the issue in his appellate brief.

[19] We use the initials of each venireperson to protect that venireperson's legitimate privacy interests.

[20] During L's voir dire, the court explained to him that when it becomes apparent that a venireperson is a full-time student, usually he or she is excused from jury service, but that it is the student's choice.

venirepersons, she had never had a college student say that he so much wanted to sit on a case that he was willing to neglect his studies. She also indicated that her concerns about L were "completely affirmed" by the fact that his uncle had been prosecuted for a drug related crime and by his statement that he felt "as if a lot of people have been falsely charged" with crimes. The prosecutor concluded by stating that her reasons for excusing L were "absolutely . . . race neutral." Thereafter, the court excused L without further comment or objection by defense counsel.

Once the state met its burden of providing race neutral reasons for excusing the venireperson, "it was incumbent upon the defendant to persuade the trial court that the state's reasons were insufficient or pretextual. To have done so, the defendant could have advanced reasons that are salient to a showing of pretext." (Internal quotation marks omitted.) *State v. Beltran*, 246 Conn. 268, 280, 717 A.2d 168 (1998). The defendant's failure to provide the court with such reasons may be treated as acquiescence in the validity of the prosecutor's explanation. Id. "Given the defendant's silence, the only inference that the trial court could have drawn was that the defendant accepted the state's explanation." (Internal quotation marks omitted.) *State v. Salvatore*, 57 Conn. App. 396, 406, 749 A.2d 71, cert. denied, 253 Conn. 921, 755 A.2d 216 (2000).

The record, moreover, fully supports the court's finding that the state's reasons for excusing L were legitimate.[21] L testified that his uncle had been prosecuted for a drug related crime.[22] "Courts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prose-

[21] We note that, in its January 3, 2002 articulation, the court stated that the defendant's *Batson* claim as to L was "denied as being totally unfounded."

[22] We note that in the present case, the defendant also was charged with a drug related crime.

cuted because of the real possibility that the venire-person may harbor resentment against prosecuting authorities generally." *State* v. *Hodge,* supra, 248 Conn. 231. In addition, L's opinion that "a lot of people have been falsely charged" with crimes was an equally valid basis for the prosecutor's concern about his serving as a juror. Indeed, L's response fairly implies an unaccept-able bias against the judicial system of a quality that a prosecutor, on the basis of her experience, judgment and intuition, could legitimately use a peremptory chal-lenge. See *State* v. *Hinton,* supra, 227 Conn. 331. Finally, the prosecutor's comment that on the basis of her expe-rience, it was "unusual" that a full-time student would so much want to sit on a case that he would be willing to neglect his studies also supports a finding that the state exercised the challenge for a valid, race neutral reason. Accordingly, the defendant cannot prevail on his claim that the state's exclusion of L was improper.

B

Venireperson R

The state exercised another peremptory challenge against venireperson R, an African-American male. Dur-ing voir dire, R indicated that he was disabled, a "com-munity activist" and a member of the Berkeley Heights Tenant Council Association, which he said deals with tenant issues as well as other issues that affect the community. When asked by the prosecutor if he had ever had to contact the police in his role as a community activist, R responded that he had talked to the police "on different issues" and their response was "50 percent good, 50 percent poor." He explained that he believed that the police responded "poorly" to drug related issues in that they "didn't respond. They don't respond to all the people's calls when they're called." He also indicated that that he thought that the police were "not totally on top of it." Despite his belief about the inade-

quate police response to drug related issues, he stated that this would not make it difficult for him to be fair if chosen as a juror. The prosecutor then asked R about his exposure to crime. R testified that he had never known anyone who was a victim of a crime, who witnessed a crime or who might have been arrested and charged with a crime.

When the state exercised a peremptory challenge to remove R from the panel, defense counsel requested that "the state be required to articulate" pursuant to *Batson*. In response, the prosecutor observed that one of the jurors who already had been accepted was African-American and that there was no systematic effort on her part to exclude minority jurors. She then stated that she had several reasons for challenging R. Specifically, she indicated that she found it difficult to believe that he had been totally unaffected by crime, even though he lived in a "very high crime complex." The prosecutor also indicated that she was concerned about R's negative attitude with respect to the police because the state's case depended very heavily on police testimony. Finally, the prosecutor stated that the state was concerned with R's belief that the police responded inadequately to drug related issues because the case was "going to produce evidence relating to drug dealing on both sides, the victim's side as well as the defense side."

The defendant claimed that those reasons were insufficient to establish a legitimate, nonracial basis for the state's peremptory challenge against R. In particular, defense counsel maintained that R's responses during voir dire indicated "quite clearly" that his negative police experiences "would not affect his objectivity in relation to evaluating the testimony of police officers" and that the state's concerns "hardly [rose] to the level of an articulable basis for a peremptory challenge . . . ." He also implied that the state was systematically

excluding minority jurors and requested that the court seat R as a juror.

The court upheld the state's use of the peremptory challenge to excuse R, concluding that it did not "see any systematic exclusion of any minorities in this particular case." The court also noted that during voir dire, defense counsel asked R only one question.[23]

We agree with the state that the record fully supports the court's finding that the state's reasons for excusing R were legitimate.[24] In his testimony, R indicated that he had a negative opinion concerning police performance, especially with respect to drug related crime. In light of the state's considerable dependency on police testimony in this case and the fact that the crime charged was drug related, the state's concerns here were reasonable and properly served as a valid, nondiscriminatory basis for excusing R. Although R stated that he would not allow those considerations to affect his impartiality as a juror, "a prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." *State* v. *Hodge*, supra, 248 Conn. 231.

In addition, the prosecutor's opinion that she found it difficult to believe R's testimony that he had been totally unaffected by crime, even though he lived in a high-crime complex, was a legitimate reason for excusing R. "[T]he fact a prosecutor distrusts a juror or finds [the juror's] responses not to be credible [may] be a sufficiently race-neutral reason for using a peremptory challenge." (Internal quotation marks omitted.) *State* v.

---

[23] During voir dire, defense counsel asked R the following question: "Can you think of any reason at all why you couldn't be a fair minded juror in this case?" R answered as follows: "No, no reason."

[24] We note that in its January 3, 2002 articulation, the court stated that the defendant's *Batson* claim as to R was "denied as being totally unfounded."

*Hinton,* supra, 227 Conn. 326–27; see also *State* v. *Smith,* 222 Conn. 1, 14, 608 A.2d 63 ("venireperson's assessment of his own prejudices may be untrustworthy for a variety of reasons"), cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). The record, therefore, supports the court's implicit finding that the state's reasons for excusing R were not pretextual. Accordingly, after an independent and scrupulous examination of the entire record, we conclude that the court's rejection of the defendant's *Batson* claim with respect to R was not clearly erroneous.

## II

The defendant next claims that he is entitled to a new trial because the court improperly failed to dismiss the selected jurors and the remaining venire, and begin anew the jury selection process after it found a *Batson* violation as to a third minority venireperson, N. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. The state exercised another peremptory challenge against venireperson N, a Hispanic male. During voir dire, N indicated that he worked as a bartender at a cafe in Danbury and frequently traveled to New York City to interview for acting parts. He stated that he "gave up a leading role in a Broadway show" to be in court that day. When questioned by the prosecutor about whether working until 3 a.m. as a bartender would pose a problem for him being at court on time, N replied, "It could be tough." N further stated that the inconvenience of serving on the jury depended on the trial's duration. The prosecutor then asked him if he thought his work schedule would make serving on the jury "a little difficult." N responded, "It might make it difficult, honestly."

The court asked N which days might be problematic for him, and he said that he "would be home somewhere

around three or four in the morning" on Friday if the trial continued until then. The court asked N if he would be tired if that occurred, and he replied, "Right now, I'm sitting on four hours of sleep, but I feel fine." The court reminded N that the trial could continue until Monday and that he would have to be in court that morning after working late on Sunday night. N indicated that he was aware of that possibility. The court also asked N whether he thought his work schedule would be "a major impediment to [his] sitting on [the] case . . . ." N replied, "I will basically do what I have to do."

At the conclusion of the voir dire, the state exercised a peremptory challenge to excuse N. Defense counsel objected pursuant to *Batson* and requested that N be seated on the jury unless the state could provide an "articulable basis" for exercising the peremptory challenge. In response, the prosecutor stated: "[T]he reason I excused this individual is that he does not have a lot of life experiences in terms of a work environment. He has worked as a bartender, as an actor. His life tends to be a little haphazard with regard to some structure. He said he would be getting home at four o'clock . . . [a]nd that concerned me. The idea [that] he's going to New York looking for jobs. He says he gives up a lead in a Broadway role. All of those issues . . . make him a difficult juror for a very serious case." Defense counsel contended that there was no basis for the state to excuse N and again requested that he be seated as a juror. Thereafter, the court stated that it was "going to grant [the defendant's] motion" and, without further comment, ordered that N be seated as the twelfth juror.

On the day the presentation of evidence was scheduled to begin, defense counsel, pursuant to *State* v. *Gonzalez*, supra, 206 Conn. 400,[25] sought to dismiss the

[25] In *State* v. *Gonzalez*, supra, 206 Conn. 400, our Supreme Court stated that if the defendant is found to have sustained his burden of showing a *Batson* violation, "the trial court must then dismiss the jurors thus far selected and the remaining venire, and begin anew the jury selection process."

selected jurors and the remaining venire and begin anew the jury selection process. The court denied the defendant's motion to dismiss. Noting that the defendant was relying on dicta, the court stated that *Gonzalez* was confined to its facts and that to apply it to this case "works . . . an injustice and detracts again from judicial efficiency," especially in light of the fact that the defendant obtained the remedy that he specifically had requested. At that time, the court also stated that the defendant's other *Batson* challenges were completely meritless.

On November 19, 2001, this court, sua sponte, ordered the trial court to articulate "the legal reasoning and factual basis for (1) its ruling with respect to the defendant's *Batson* . . . challenge to the state's exercise of a peremptory challenge to excuse venireperson [N] and (2) its subsequent decision to seat [N]." On January 4, 2002, the court filed its articulation,[26] and stated that "[t]here was no systematic exclusion of a racial group in this case" and that it found a *Batson* violation as to N because it "could not exclude the possibility that the state's challenge of [N] was pretextual." The court also indicated that it granted the defendant's motion to seat N "as a remedy for any perceived impropriety," and that "in the worst case scenario for the prosecution, only one peremptory challenge was even suspect."

The defendant now claims that the court's decision to seat N constituted an implicit finding that the defendant had "sustained his burden of proving that the state's use of its peremptory challenges was due to an impermissible racial motive" and that this, "in and of itself," required the court to dismiss the selected jurors and

---

[26] On February 21, 2002, this court ordered the parties to file supplemental briefs on the following issues: "(1) Whether the trial court's ruling was proper with respect to the defendant's *Batson* . . . challenge to the state's exercise of a peremptory challenge to exclude venireperson [N]?" and "(2) Whether the trial court's subsequent decision to seat [N] was proper?"

the remaining venire, and begin anew the jury selection process. The defendant also claims that the court's implicit finding supports his contention that the "voir dire was rife with racial bias" and that "[o]nce the court found that the strike against [N] was racially motivated, it should then have reviewed the strikes against [L] and [R] and found that they, too, were impermissible." We disagree.

Initially, we note that we should not consider the appropriate remedy for a *Batson* violation unless we determine that the state actually committed such a violation in this case. See id. After reviewing the record and the court's articulation, we are persuaded that the defendant failed to meet his burden of showing that the state's peremptory challenge of N was racially motivated. We therefore conclude that the court's determination that the state committed a *Batson* violation was clearly erroneous.

To prevail on his *Batson* challenge, "the defendant bears the burden of persuading the trial court by a preponderance of the evidence that the state's use of the peremptory challenge was tainted by purposeful racial discrimination." *State* v. *Holloway*, 209 Conn. 636, 640–41, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). Thus, when ruling on a *Batson* challenge, the court has "the duty to determine if the defendant has established purposeful discrimination." (Internal quotation marks omitted.) *State* v. *Hinton*, supra, 227 Conn. 323; see also *State* v. *Gonzalez*, supra, 206 Conn. 399–400 (defendant must show that but for prosecutor's invidious purpose, juror would not have been challenged).

In ruling on the defendant's *Batson* challenge with respect to the state's excusal of venireperson N, the court granted the defendant's motion to seat N without making any findings regarding purposeful discrimina-

tion. The defendant asserts that the court's seating of N constitutes an implicit finding that the defendant had established purposeful discrimination. In its articulation of its ruling, the court clarified that it seated N because it "could not *exclude the possibility* that the state's challenge was pretextual." (Emphasis added.) The mere possibility that the state's peremptory challenge was pretextual, however, is not a sufficient basis to find a *Batson* violation. *Batson* mandates much more than that. Either purposeful racial discrimination has been proven or it has not; there is no hybrid position. The court also indicated that it decided to seat N "as a remedy for *any perceived impropriety*" and that it was "acting with an *abundance of caution*." (Emphasis added.) As we read the applicable law, seating a juror as a remedy for "perceived impropriety" and for precautionary reasons is not part of a proper *Batson* analysis.

The record, moreover, indicates that the state's reasons for excusing N were legitimate and not pretextual. The prosecutor's concerns with respect to N's late night work schedule were well founded and, under the circumstances, a legitimate, nondiscriminatory reason for exercising a peremptory challenge. See *State* v. *Hernandez*, 170 Ariz. 301, 306, 823 P.2d 1309 (App. 1991) ("[s]triking a prospective juror because of perceived or anticipated fatigue is acceptable"). Indeed, N himself stated that his work schedule might make serving on the jury "difficult." In addition, it was appropriate for the prosecutor to consider N's general experience, work history and "haphazard" life in ascertaining his suitability as a juror. See *State* v. *Hodge*, supra, 248 Conn. 257; *State* v. *Hernandez*, supra, 305–306. Finally, the fact that at the time of the *Batson* challenge, the state already had accepted a minority venireperson and that "in the worst case scenario for the prosecution, [this was the] only . . . peremptory challenge [that] was even suspect," lends additional support to our conclusion that the state

did not engage in purposeful discrimination as to N. The defendant therefore failed to meet his burden of showing that the state's peremptory challenge of N was racially motivated. Accordingly, the court's determination that the state committed a *Batson* violation was clearly erroneous and its subsequent decision to seat N was improper.

In light of the foregoing, we conclude that the defendant was entitled to no relief on his *Batson* challenge and the fact that he received the relief that he requested, i.e., the seating of N on the jury, renders the court's error harmless as to the defendant. Accordingly, the defendant's claim is without merit.[27]

---

[27] Even if we determined that the record and the articulation warranted a finding that the state had committed a *Batson* violation as to venireperson N, the result would be the same in this case. The defendant cannot escape the fact that he received the precise remedy that he requested for any *Batson* violation as to N. His contention that *State* v. *Gonzalez*, supra, 206 Conn. 400, *mandates* that a court must begin the jury selection process anew when it sustains a *Batson* challenge is incorrect because the language that he relies on for that proposition is dictum. See *State* v. *Jones*, 29 Conn. App. 304, 354, 615 A.2d 149 (1992) (*Norcott, J.*, dissenting and concurring). In *Jones*, then judge, now Supreme Court Associate Justice Flemming L. Norcott, Jr., stated in his dissenting and concurring opinion that "[a] split of authority exists as to whether a court, after finding a *Batson* violation, always must dismiss those jurors selected, along with the rest of the venire, and begin the process anew." Id., 354 n.29 (*Norcott, J.*, dissenting and concurring). Although Judge Norcott concluded that under the circumstances in *Jones*, beginning the jury selection process anew was the appropriate remedy to give effect to the mandate of *Batson*; id., 354 (*Norcott, J.*, dissenting and concurring); those same circumstances are not present in this case.

"The rationale behind striking the entire jury pool is to provide the complaining party with a proper venire and not one that has been partially or totally stripped of potential jurors through the use of discriminatory peremptory challenges." *Jefferson* v. *State*, 595 So. 2d 38, 40 (Fla. 1992). Here, seating N was the more appropriate remedy because even if the state had improperly used its peremptory challenge with respect to N, that had no effect on the composition of the pool, and, therefore, the defendant was not deprived of a proper venire. See id. Indeed, under the circumstances in the present case, we perceive no benefit in striking the entire panel and incurring the additional time and expense of beginning the jury selection process anew. See id. Therefore, contrary to the dictum in *Gonzalez*, we believe that when a defendant is found to have sustained his burden of

## III

The defendant next claims that he is entitled to a new trial because the court improperly refused to charge the jury on intoxication as it related to the state's burden of proving specific intent. Specifically, he claims that there was "sufficient evidence to charge the jury on intoxication." We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. At trial, the state introduced two sworn statements in which the defendant admitted killing the victim and provided a detailed description of the manner of the killing. The defendant concluded one of those statements by stating: "I wish to say that I had been drinking vodka that day before I shot Andy Scott. I would not normally have done that if I was not drinking." When the defendant later testified, he recanted his sworn statements. Although he admitted that he had signed both statements, he denied that he provided the police with the information that was in those statements. He also testified that he signed the statements without reading them and that he signed them only because the police told him that it would benefit him.

At the close of evidence, the defendant requested that the court give the jury "a standard instruction on intoxication, consistent with General Statutes § 53a-7." At the hearing on the defendant's request to charge, defense counsel argued that even though the defendant had recanted his sworn statements, the intoxication issue fairly was raised by the defendant's purported comment that he would not have shot the victim had he not been drinking vodka that day. The state contended that the defendant's mere claim that he had been

showing a *Batson* violation, the better practice is to leave it to the discretion of the trial court to fashion the appropriate remedy, depending on the circumstances of the particular case. See id.

drinking was not sufficient to warrant an instruction on intoxication. The court denied the defendant's request to charge on intoxication, and the defendant excepted to the court's refusal to grant his request.[28]

The defendant claims that his statement regarding his drinking vodka might have raised a reasonable doubt as to the existence of his specific intent to commit murder. "[W]hile intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder." (Internal quotation marks omitted.) *State* v. *Austin*, 244 Conn. 226, 239, 710 A.2d 732 (1998); see also General Statutes § 53a-7. "[A]n instruction on intoxication [therefore] would be warranted [in the present case] if sufficient evidence was introduced to justify it." *State* v. *Folson*, 10 Conn. App. 643, 651, 525 A.2d 126 (1987). "Because the state has the burden of proving the element of specific intent, the quantum of evidence essential to warrant consideration of the effect of intoxication on the defendant can be no greater than that which might have raised a reasonable doubt as to the existence of the specified mental state." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 44 Conn. App. 818, 822, 692 A.2d 846, cert. denied, 242 Conn. 902, 697 A.2d 363 (1997).

"We have previously held that it is not necessary for a defendant to present evidence of the effect of an intoxicating substance on him to require an instruction on intoxication and specific intent. The jury is permitted to infer from the fact that an intoxicating substance was ingested that an incapacity to form a specific intent resulted. . . . This does not mean, however, that only

---

[28] On March 30, 1999, the defendant filed a motion for a new trial, which was based, in part, on the court's refusal to grant his request to charge on intoxication. On June 16, 1999, the court denied the defendant's motion.

the slightest evidence of the possibility of intoxication is sufficient to require a court to give a requested charge on intoxication and specific intent." (Citation omitted.) Id.

In the present case, the only evidence of the defendant's intoxication at the time of the murder was his statement that he had consumed vodka on the day he shot the victim. Even putting aside the self-serving aspect of the defendant's statement, it yields no reasonable inference as to the amount of vodka that the defendant allegedly consumed and when he consumed the vodka vis-a-vis the time the murder occurred. The statement, therefore, provides no basis, other than pure speculation, for the jury to infer that the defendant was intoxicated to the point of incapacity to form the specific intent to murder the victim. Moreover, we can find no further indication in the record to support an inference that the defendant was intoxicated at the time the murder occurred.

Under those circumstances, the court reasonably determined that there was not such "a quantum of evidence" as would allow the jury to form a reasonable doubt as to the defendant's specific intent to murder the victim on the basis of an intoxication claim. See id., 822–23. To conclude otherwise would require a court, on the slightest reference of possible intoxication, to give a requested charge on intoxication. Accordingly, viewing the evidence in the light most favorable to supporting the requested jury charge; see *State* v. *Folson*, supra, 10 Conn. App. 651; we conclude that the court properly refused to charge the jury on intoxication.[29]

---

[29] We note that the defendant's attempt to distinguish *State* v. *Rodriguez*, supra, 44 Conn. App. 818, is unavailing because the "quantum of evidence" that we determined was insufficient to warrant a charge on intoxication in that case was more than we have in the present case.

## IV

The defendant next claims that he is entitled to a new trial because the court improperly refused to charge the jury on his "sole theory of defense" and that, coupled with the court's "partisan bolstering of the state's case, separately and together, denied [him] a fair trial." We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. As previously indicated, at trial, the state introduced two sworn statements in which the defendant had admitted killing the victim. It also introduced Maksuti's sworn statement in which she stated that the defendant had admitted to her that he killed a man in Watertown. Both the defendant and Maksuti later recanted their statements. During cross-examination of Sergeant Blanchard, defense counsel asked whether it was the Watertown police department's policy to videotape certain suspects and why the defendant's confessions were not audiotaped or videotaped.

During closing argument, defense counsel vigorously attacked the reliability of the defendant's and Maksuti's sworn statements. In particular, he questioned the credibility of the police officers who testified regarding the process that was used to obtain the statements and the fact that there was no recordation of that process. He stressed that the jury should focus on the process by which the state obtained the statements, and the circumstances and atmosphere in which they were obtained, and not on the statements' contents.

In his request to charge, the defendant requested the court to give the jury a cautionary instruction regarding confession evidence.[30] The court declined to give the

[30] The defendant's request to charge as to confession evidence states in relevant part: "Let me now caution you that you, the jury, should give such weight to the so-called confession or admission evidence as you, the jury, feel it deserves under all the circumstances. In determining what weight you consider it is entitled to, you consider all the circumstances under

requested cautionary instruction. In its instructions to the jury, the court first gave general instructions on the jury's duty to determine witness credibility and to assess the weight of the evidence. It then gave specific instructions on assessing the credibility of testimony given by expert witnesses, police officers and the defendant. The court also instructed the jury as follows: "There is no law in the state of Connecticut requiring police officers to audiotape or videotape the statements of any person, be they a witness or a suspect. The general policy in Connecticut is not to videotape or audiotape such statements."

At the conclusion of the court's jury instructions, defense counsel excepted to the court's instruction that the general policy in Connecticut is not to tape statements and requested that the court give a curative instruction directing the jury to disregard its comment on that issue. The court refused to give a curative instruction. Thereafter, the defendant filed a motion for a new trial, based, in part, on the court's failure to give the cautionary instruction regarding confession evidence and the court's improper comment with respect to Connecticut's general policy on taping statements. The court denied the defendant's motion.

A

The defendant first claims that the court violated his right to present a defense and to due process by refusing to give his requested cautionary instruction regarding confession evidence. We are not persuaded.

which it was procured so far as these circumstances have been made clear to you by the evidence. They include, among other things, the fact that the accused was in the police station at the time. Consider whether the defendant was acting under any duress or strain or whether any coercion, physical or psychological, was employed by the police. Unless you, the jury, believe beyond a reasonable doubt that the contents of the statement were proven, you shall not consider such statement in your deliberation."

"[A] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . A defendant who asserts a recognized legal defense, the availability of which is supported by the evidence, is entitled as a matter of law to a theory of defense instruction." (Internal quotation marks omitted.) *State* v. *Amado*, 254 Conn. 184, 193, 756 A.2d 274 (2000). "When a defendant admits the commission of the crime charged but seeks to excuse or justify its commission so that legal responsibility for the act is avoided, a theory of defense charge is appropriate. A defendant must, however, assert a recognized legal defense before such a charge will become obligatory. A claim of innocence or a denial of participation in the crime charged is not a legally recognized defense and does not entitle a defendant to a theory of defense charge." (Internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 88–89, 621 A.2d 728 (1993).

Applying those principles, we determine that the defendant's "theory of defense," namely, that he was innocent and that the statements introduced into evidence by the state were unreliable, is not a legally recognized defense under our law and, therefore, the defendant was not entitled to a theory of defense charge. Accordingly, the defendant's claim that his right to present a defense and his due process rights were violated by the court's refusal to give his requested cautionary instruction regarding confession evidence is without merit.[31]

---

[31] We note that the cautionary instruction requested by the defendant may be fairly characterized as a request for a specific instruction on assessing the credibility of the sworn statements that were admitted into evidence. Whether the jury instructions on credibility should specifically address any of the factors that the defendant urges is a matter best left to the trial court's discretion, and the refusal to give such an instruction is improper only if, under the circumstance, it was an abuse of discretion. See *State* v. *Charlton*, 30 Conn. App. 359, 368, 620 A.2d 1297, cert. denied, 225 Conn. 922, 625 A.2d 824 (1993). We conclude that the court's instructions on credibility gave adequate guidance to the jury in reaching a proper verdict and, therefore, the court did not abuse its discretion in refusing to give the requested instruction.

## B

The defendant next claims that the court's instruction to the jury regarding the general policy of Connecticut police departments not to audiotape or videotape statements constituted partisan bolstering of the state's case and deprived him of his due process right to a fair trial before an impartial jury. He also claims that the jury was misled by the court's improper comment. We are not persuaded.

"Our analysis begins with a well established standard of review. When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled. . . .

"In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the

charge, considered as a whole, presents the case to the jury so that no injustice will result. (Citations omitted; internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 713–14, 741 A.2d 913 (1999).

"It is clear that [t]he trial court should submit no issue to the jury which is foreign to the facts in evidence, or upon which no evidence was offered, and it should not submit to the jury considerations which find no support in the evidence." (Internal quotation marks omitted.) *State* v. *Campbell*, 225 Conn. 650, 659, 626 A.2d 287 (1993).

Initially, we agree with the defendant that the challenged comment was improper because it was not supported by any evidence in the record. We do not agree, however, that the court's single comment, when viewed in the context of the entire charge, deprived the defendant of a fair trial, misled the jury or was partisan in any way.

Although the court's comment was improper, viewed in context, it cannot be argued, without sheer speculation, that "it cemented police credibility" or "devastated the entire defense," as the defendant claims. By properly instructing the jury that Connecticut law does not require the police to tape statements of witnesses and suspects,[32] the court appropriately indicated that the jury could not reasonably infer that the police somehow had acted improperly with respect to Maksuti's and the defendant's statements solely on the ground that the police did not audiotape or videotape them. The defendant, nevertheless, argues that although the police are not required to tape statements, without the court's

---

[32] We note that the defendant gives little weight to the important fact that the court's "general policy" remark came immediately after a related and perfectly proper statement that "[t]here is no law in the state of Connecticut requiring police officers to audiotape or videotape the statements of any person, be they a witness or a suspect."

"general policy" comment, the jury may have found that it was "suspicious" that the police did not tape the statements. The defendant's argument is unconvincing because the policies followed by other police departments clearly have no bearing on this case, and it is quite difficult to comprehend, absent speculation, how the jury would find "suspicious" the fact that the police in the present case did not tape the statements unless it was their departments' specific policy to do so. Moreover, to argue, as the defendant does, that once the jury "learned" of the general policy, "its doubts about the prosecution were eliminated," is disingenuous and totally unsupported by the record.

The court's "general policy" comment merely stated that in Connecticut, the general policy of police departments is not to tape statements of witnesses and suspects. We find nothing in the court's single comment that diminished, let alone "devastated," the defendant's defense. In addition, the defendant's assertion that the court's comment "greatly exacerbated" the court's "improper refusal to charge on [his] theory of defense" is without merit because, as we have shown, the court's refusal to charge was completely proper. We conclude, therefore, that when the challenged comment is considered in light of the charge as a whole, it is not reasonably possible that the jury was confused or misled by the court's improper instruction. See *State* v. *Griffin*, supra, 251 Conn. 714.

The defendant's final claim regarding the court's "general policy" comment is that it was partisan and that in making it, the court became "the state's most powerful advocate." Again, we are not persuaded.

We recognize that "[d]ue process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." (Internal quotation marks omitted.) *State* v. *Fernandez*, 198 Conn. 1, 10, 501 A.2d 1195 (1985).

"A trial court has broad discretion to comment on the evidence adduced in a criminal trial. . . . A trial court often has not only the right, but also the duty to comment on the evidence. . . . The purpose of marshaling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict impartiality." (Internal quotation marks omitted.) *State* v. *Flowers*, 69 Conn. App. 57, 75–76, 797 A.2d 1122, cert. denied, 260 Conn. 929, 798 A.2d 972 (2002). "Any claim that the trial judge crossed the line between impartiality and advocacy is subject to harmless error analysis." *State* v. *Burke*, 51 Conn. App. 328, 335, 723 A.2d 327 (1998), cert. denied, 248 Conn. 901, 732 A.2d 177 (1999).

We perceive nothing partisan or partial in the court's "general policy" comment. The defendant's argument that in making the comment, the court became "the state's most powerful advocate" is wholly without merit on the record before us. Moreover, even if we characterize the court's comment as partisan, it was harmless in the context of the present case.

Despite the defendant's efforts to attribute grave consequences to the court's "general policy" comment, such consequences simply do not reasonably follow from his unconvincing arguments. We therefore reject the defendant's claim that he is entitled to a new trial because the court's "partisan bolstering of the state's case" denied him a fair trial. We are satisfied that the court's charge as a whole was adapted to the issues and sufficient for the guidance of the jury in arriving at a fair verdict.

V

The defendant's final claim is that he is entitled to a new trial because the court improperly instructed the jury on reasonable doubt. Specifically, he claims that

the court improperly defined a reasonable doubt as (1) "such doubt as in serious affairs that concern you, you would heed. That is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of great importance," (2) "a real doubt, an honest doubt," and (3) a doubt that was "reasonable in light of the evidence after a fair comparison and careful consideration of the entire evidence."[33] We do not agree.

The defendant's claim of instructional error regarding the burden of proof presents us with a question involving a claim of fundamental constitutional rights.[34] See, e.g., *State* v. *Morant*, 242 Conn. 666, 687, 701 A.2d 1 (1997). "It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. . . . The

---

[33] The court instructed the jury regarding reasonable doubt as follows: "The meaning of the term reasonable doubt can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess or mere conjecture, nor is it a doubt suggested by a juror not warranted by the evidence. It is such doubt as in serious affairs that concern you, you would heed. That is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of great importance.

"It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is doubt that is honestly entertained and is reasonable in light of the evidence after fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there is something in the evidence or lack of evidence that leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of the doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion."

[34] "The defendant invokes both the United States constitution and the constitution of the state of Connecticut in support of his claims in his brief. He has not, however, provided any independent analysis of the state constitutional claims. We therefore decline to review them." *State* v. *Davis*, 51 Conn. App. 171, 176 n.10, 721 A.2d 146 (1998).

[reasonable doubt concept] provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. . . . [Consequently, the] defendants in a criminal case are entitled to a clear and unequivocal charge by the court that the guilt of the defendants must be proved beyond a reasonable doubt. . . .

"When determining whether it was reasonably possible that the jury was misled by the trial court's instructions, we will review the charge as a whole and consider its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 296, 780 A.2d 53 (2001).

The defendant first challenges the court's statement that reasonable doubt is "such doubt as in serious affairs that concern you, you would heed. That is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of great importance." The court's language nearly was identical to reasonable doubt instructions we recently affirmed in *State* v. *Anderson*, 65 Conn. App. 672, 686, 783 A.2d 517 (2001), and *State* v. *Orta*, 66 Conn. App. 783, 796, 786 A.2d 504 (2001), cert. denied, 259 Conn. 907, 789 A.2d 997 (2002). We conclude that this language, when considered in the context of the court's reasonable doubt charge as a whole, did not dilute the state's burden of proof.

The defendant next challenges the court's statement that reasonable doubt is "a real doubt, an honest doubt." That claim requires little discussion. Our Supreme Court consistently has held that the definition of reasonable doubt as "a real doubt, an honest doubt" does not dilute the state's burden of proof when viewed in the context of an entire charge. See, e.g., *State* v. *Ferguson*, 260 Conn. 339, 371, 796 A.2d 1118 (2002); *State* v. *Whipper*, supra, 258 Conn. 297; *State* v. *Velasco*, 253 Conn. 210, 248–49, 751 A.2d 800 (2000).

The defendant finally challenges the court's statement that reasonable doubt is doubt that "is reasonable in light of the evidence after fair comparison and careful examination of the entire evidence." In *State* v. *Anderson*, supra, 65 Conn. App. 686, we found "nothing inherently unfair" in a nearly identical instruction. Moreover, we see no reasonable possibility that the challenged language, when read in the context of the entire charge regarding reasonable doubt, misled the jury in its understanding of the state's burden of proving the defendant's guilt beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other judges concurred.