******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOHN JOSEPH LAVOIE
(AC 37184)

Beach, Keller and Harper, Js.

*Argued April 9—officially released June 30, 2015*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*Richard Emanuel*, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's
attorney, with whom, on the brief, were *David Shepack*,
state's attorney, and *Dawn Gallo*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, John Joseph LaVoie, appeals from the judgment of conviction, rendered after a jury trial, on two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and (5).[1] The defendant claims that (1) the trial court erred by (a) denying his motion to introduce the testimony of an expert witness and (b) failing to conduct an evidentiary hearing sua sponte on his offer of proof regarding the expert witness' proffered testimony, (2) the trial court erred by declining his request to provide the jury with an instruction on intoxication, and (3) prosecutorial improprieties occurred when the prosecutor made improper comments during her closing argument and, as a result, he was deprived of his right to a fair trial or, alternatively, that this court should invoke its supervisory authority to reverse his conviction. We affirm the judgment of the court.

The following facts, which a reasonable jury could have found, and procedural history are relevant here. The defendant, who has been a paraplegic and confined to a wheelchair since 1975, was married to the victim, Shelly LaVoie, for twenty-three years until they divorced in April, 2010. Sometime toward the end of September or early October, 2009, the defendant began to suspect that the victim was having an affair. He confronted her about his suspicions in early October, 2009, but she denied his accusations.

The defendant continued to question the victim's fidelity. He hired a private investigator sometime in October or November, 2009, to identify the source of a telephone number that he had discovered on the victim's primary cell phone account and to follow her on one occasion when she told the defendant that she was going shopping. On the day that the private investigator followed the victim, he observed her meeting with Lenny Morey, who was employed at the time as the defendant's landscaper and handyman, at a K-Mart shopping center in Torrington. The defendant, assuming that the victim was having an affair with Morey, confronted Morey at his Torrington home sometime in November, 2009. Morey denied the defendant's accusation that he was having an affair with the victim and stated that they merely shared a platonic friendship. Morey also informed the defendant that the victim owned a second cell phone of which the defendant was unaware, and provided the defendant with the telephone number for her second cell phone.[2] The defendant fired Morey from his employment after their conversation.

In early or mid-November, 2009, without the victim's knowledge, the defendant placed a global positioning system (GPS) device and a tape recorder in a car that he shared with the victim. Shortly thereafter, the tape

recorder recorded a romantic encounter between the victim and Morey together in the car. On November 20, 2009, the defendant informed the victim that he knew of her second cell phone, that he had hired a private investigator to follow her, and that he had tape-recorded a romantic encounter between her and Morey. After hearing the recording, the victim admitted to having an affair with Morey and agreed to end her relationship with Morey. The following day, on November 21, 2009, the victim met with Morey to end their relationship. While the victim met with Morey, the defendant remained at their marital home in Litchfield and tracked the victim's whereabouts via the GPS. According to the GPS data, the victim spent approximately one and one-half hours with Morey, which troubled the defendant. The defendant subsequently asked the victim why she had spent an extended period of time with Morey, to which she responded that she had a sore throat and did not want to discuss the matter. The next day on November 22, 2009, the victim told the defendant that she was taking her brother's children to a movie theater. The defendant used the GPS device to track her movements and observed the victim driving in the vicinity of Morey's home. Upon returning home, the defendant questioned the victim about her whereabouts that day, but she refused to respond due to her sore throat.

On November 23, 2009, the defendant traveled to the Litchfield town clerk's office to obtain a hunting license application. Afterward, he went to a store called Tactical Arms and registered for a gun training class. He subsequently traveled to a store called Dick's Sporting Goods, located in Canton, to purchase a box of .22 caliber bullets and two .22 caliber bullet magazines. Later in the day, he manually loaded each magazine with ten bullets, the maximum capacity that each magazine could hold, and attached one of the magazines to a .22 rifle he owned. Finally, he visited an attorney to discuss filing for divorce from the victim.

On the morning of November 24, 2009, the defendant and the victim were at their marital home preparing to go shopping. The victim went outside to retrieve a newspaper from their mailbox, which was located at the end of their driveway. The defendant believed that the victim had been outside retrieving the newspaper for an extended period of time and grew suspicious that she was talking to someone on her second cell phone. When she returned with the newspaper, the defendant asked her whether she had been speaking with someone on the phone while outside. The victim responded that she did not bring either of her cell phones with her, and that her second cell phone was charging upstairs. The defendant ordered the victim to go upstairs to retrieve her second cell phone.

After the victim ventured upstairs, the defendant went to the garage and retrieved the .22 rifle. The defen-

dant returned from the garage, with the rifle resting on the side of his wheelchair out of plain sight, and waited near the staircase for the victim to return. Shortly thereafter, the victim came down the staircase with her second cell phone. The defendant, without revealing the rifle, ordered the victim to give him the cell phone. She refused and began walking away from him. At that point, the defendant placed the rifle onto his lap and again ordered the victim to give him the cell phone. Upon seeing the rifle, the victim began running away from the defendant toward their bedroom. The defendant followed her. The victim attempted to shut the door to the bedroom, but the defendant managed to use his wheelchair to prevent the door from closing and entered the room. The victim then ran into the bathroom adjacent to their bedroom and attempted to close the door behind her, but the defendant managed to use his wheelchair to keep the door to the bathroom ajar. The victim went toward the window in the bathroom with the intent to open its locks, but before she could get to the window, the defendant entered the bathroom and again demanded that she give him the cell phone. When the victim turned to face the defendant, he had the rifle pointed at her with his finger on the trigger and the safety lock on the rifle turned off.[3] The victim attempted to escape the bathroom by running around and past the defendant, but she tripped over either a laundry basket or the defendant in his wheelchair and fell to the floor. The defendant then shot the victim in her right leg and threatened to shoot her again in her back.[4]

The victim managed to stand up, and a struggle ensued, during which she shoved the defendant into the bedroom, pushed him out of his wheelchair, grabbed the rifle, and threw the rifle onto their bed. As the victim attempted to escape the bedroom, the defendant grabbed her around her legs and bit down on one of her pant legs with his teeth. With his hands, he also latched onto the sweater she was wearing. The victim dragged the defendant, who did not release his bite on her pant leg, out of the bedroom, down a hallway, through the dining room, through the kitchen, and finally outside through a doorway that had an attached screen door. She hit the defendant with the screen door multiple times, which caused him to release his bite on her pant leg. She then entered her car and drove herself to Charlotte Hungerford Hospital in Torrington, where she was treated for her injuries.

After the victim had driven away, the defendant crawled back into his wheelchair, which had been left in the bedroom. He then retrieved another weapon, a shotgun, he had stored in a closet, went to the kitchen and contemplated committing suicide. Throughout the remainder of the day, the defendant had telephone conversations with a number of other individuals, including police officers. During one of the conversations with a police officer, the defendant admitted to shooting

the victim.

At 10:30 a.m. on November 24, 2009, the state police received a 911 call from the victim's mother, alerting them that the defendant had shot the victim. The police arrived outside the marital home shortly after 10:30 a.m. After a lengthy standoff, the defendant exited the home and surrendered to the police at approximately 8:10 p.m. that evening. The police escorted the defendant to Charlotte Hungerford Hospital to be evaluated. The defendant informed the staff at the hospital that he had loaded his rifle and had shot the victim, and also made the following statements: "I could have killed [the victim]. I am military trained, but I didn't, I don't want her dead. . . . I am so sorry she got shot, I don't want to hurt her anymore . . . ."

The defendant was charged with two counts of assault in the first degree in violation of § 53a-59 (a) (1) and (5).[5] The jury found him guilty on both counts and subject to a sentence enhancement under General Statutes § 53-202k. The court merged the counts and sentenced the defendant to a total effective term of ten years incarceration followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court abused its discretion by denying his motion to introduce the expert testimony of David Levi, a physician specializing in pain management who had treated the defendant before the shooting. In addition, he claims that the court erred by failing to conduct an evidentiary hearing sua sponte on the defendant's offer of proof regarding Levi's proffered testimony. We conclude that because Levi's proffered testimony was not relevant, the court did not abuse its discretion by denying the motion, and it did not err by failing to conduct an evidentiary hearing sua sponte on the defendant's offer of proof regarding Levi's proffered testimony.

The following additional facts are relevant here. During trial proceedings on November 29, 2012, the defendant filed a written motion to call Levi as an expert witness. Previously during trial, Alison Tieman, a nurse who had examined the defendant at Charlotte Hungerford Hospital after the shooting, testified that she had documented that the defendant was experiencing no pain when he arrived at the hospital. The defendant offered to call Levi as an expert witness to testify that he was constantly experiencing pain, as a consequence of physical impairments he had sustained that predated the events at issue here, in order to rebut Tieman's testimony suggesting that he was not experiencing any pain when he arrived at the hospital and to impeach her credibility. The state opposed the motion, arguing that the defendant had failed to disclose Levi as a wit-

ness in a timely manner and that Levi's testimony was not relevant because Levi had not spoken with or evaluated the defendant on the day of the shooting. The court, concluding that the evidence was not relevant, denied the defendant's motion.[6]

A

The defendant first claims that the court abused its discretion by denying his motion to introduce Levi's testimony. Specifically, he asserts that Levi's proffered testimony was relevant and that its exclusion harmed him. We disagree.

We begin by setting forth the relevant standard of review and legal principles. "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Collin*, 154 Conn. App. 102, 114, 105 A.3d 309 (2014), cert. denied, 315 Conn. 924, 109 A.3d 480 (2015).

"[E]vidence is admissible only if it is relevant. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The proffering party bears the burden of establishing [relevance]." (Citation omitted; internal quotation marks omitted.) *McBurney* v. *Paquin*, 302 Conn. 359, 378, 28 A.3d 272 (2011); see also Conn. Code Evid. § 4-1.

The defendant contends that Levi's proffered testimony was relevant because it would have impeached Tieman's testimony indicating that the defendant was experiencing no pain at the hospital, as well as other aspects of her testimony. According to the defendant, Levi would have testified that the defendant was constantly experiencing pain due to physical impairments that he had sustained prior to the events at issue here. Furthermore, he contends that Levi's proffered testimony would have included a discussion concerning the painkillers used by the defendant, which would have been relevant to the issue of whether the defendant was intoxicated at the time of the shooting.

We conclude that the court did not abuse its discretion by excluding Levi's proffered testimony on the basis of its determination that it was not relevant.[7] As

the court and the state noted, Levi did not speak to or examine the defendant on the day of the shooting. Although Levi may have offered testimony regarding the defendant's past history of experiencing pain, his proffered testimony would not have addressed the issue for which the defendant made the offer of proof: whether and to what extent the defendant was experiencing pain on the day of the shooting. As a result, Levi's proffered testimony would not have impeached Tieman's testimony indicating that the defendant was not experiencing pain at the hospital or implicated the issue of whether the defendant was intoxicated at the time of the shooting.[8]

For the foregoing reasons, the court did not abuse its discretion by denying the defendant's motion to introduce Levi's testimony.

B

The defendant next claims that the court erred by failing to conduct an evidentiary hearing sua sponte on the defendant's offer of proof regarding Levi's proffered testimony. Specifically, he claims that the court had an obligation to order an evidentiary hearing sua sponte because its exclusion of Levi's testimony "implicate[d] the fairness of the proceedings and the defendant's core constitutional rights . . . ." (Internal quotation marks omitted.) We disagree.

We begin by setting forth the relevant standard of review. Whether the court had an obligation to conduct an evidentiary hearing sua sponte presents a question of law over which we exercise plenary review. See *Gagne* v. *Vaccaro*, 154 Conn. App. 656, 671, 109 A.3d 500 (2015).

In support of his claim, the defendant cites *State* v. *Sullivan*, 244 Conn. 640, 712 A.2d 919 (1998), and *State* v. *Shaw*, 312 Conn. 85, 90 A.3d 936 (2014). Neither case supports his assertion. In *Sullivan*, our Supreme Court stated that "[a] trial court's duty of independent inquiry . . . arises in situations implicating the fundamental fairness of the proceedings and the defendant's core constitutional trial rights. *We never have held that a trial court has an independent obligation to order, sua sponte, a hearing on an evidentiary matter, in the absence of both a request for a hearing and an adequate offer of proof.*" (Emphasis added.) *State* v. *Sullivan*, supra, 650–51 n.14. Here, the defendant did not request an evidentiary hearing and, as we previously concluded, his offer of proof concerned evidence that the court properly deemed to be not relevant.

In *Shaw*, our Supreme Court stated that "[i]n order to carry [the] threshold burden of establishing relevance, a defendant must make an offer of proof as a prerequisite to obtaining an evidentiary hearing to determine the admissibility of evidence . . . . The preliminary showing must be sufficient to demonstrate that the evidence

sought to be explored in the evidentiary hearing is relevant . . . [and] to enable the trial court to make an informed ruling in connection with the exercise of its discretion on the issue. . . . When a defendant's core constitutional rights are implicated, a trial court is obligated to order, sua sponte, an evidentiary hearing on an offer of proof to determine whether the evidence is admissible." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Shaw*, supra, 312 Conn. 105–106. The foregoing language requires a trial court to hold an evidentiary hearing on a defendant's offer of proof in situations wherein a defendant's core constitutional rights are implicated *once the defendant has met the prerequisite showing that the proffered evidence is relevant.* In contrast to what the defendant appears to suggest, *Shaw* did not remove from him the burden to make the preliminary showing that Levi's proffered testimony was relevant prior to receiving an evidentiary hearing. As we previously concluded, Levi's proffered testimony was not relevant and, therefore, an evidentiary hearing to determine the admissibility of Levi's testimony was unnecessary.

For the foregoing reasons, the court did not err by failing to conduct an evidentiary hearing sua sponte on the admissibility of Levi's testimony.

II

The defendant next claims that the court erred by declining his request to provide the jury with an instruction on intoxication. Specifically, he asserts that the evidence was sufficient to show that he was impaired by intoxicating substances at the time of the shooting and, therefore, an instruction on intoxication was warranted. We disagree.

The following additional facts are relevant here. On December 4, 2012, while the court and the parties were waiting for a witness to arrive at the courthouse, the court began conducting a charge conference. The defendant submitted to the court a written instruction on intoxication that he wanted the court to provide to the jury. He argued that the evidence then currently in the record, along with evidence that had yet to be introduced, was sufficient to support a finding that he was intoxicated at the time of the shooting. The state opposed the instruction, arguing that there was no evidence to support a finding that the defendant was intoxicated at the time of the shooting. According to the state, although the defendant had testified that he had ingested four Tramadol pills prior to shooting the victim, his testimony did not warrant an instruction on intoxication because he neither provided testimony that the Tramadol pills impaired him nor introduced expert testimony explaining to the jury the effects of Tramadol. The court declined to instruct the jury on intoxication, concluding that there was insufficient evidence to support a finding that the defendant was intoxicated at

the time of the shooting and that such an instruction potentially would lead the jury to speculate in regard to the issue.

The following day, on December 5, 2012, the court continued the charge conference after the evidentiary portion of the trial had concluded. The defendant renewed his request for the court to instruct the jury on intoxication, citing additional evidence that he argued was sufficient to support a finding that he was intoxicated at the time of the shooting. The state objected to the request, reasserting its previous argument that the evidence was insufficient to support a finding that the defendant was intoxicated at the time of the shooting and that the defendant had not introduced any expert testimony discussing the impairing effects of any of the substances that allegedly impacted him at the time of the shooting. Following argument, the court denied the request, again determining that the evidence failed to support a finding that the defendant was intoxicated at the time of the shooting.

We begin by setting forth the relevant standard of review and legal principles. "It is the law of this state that a request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given." (Internal quotation marks omitted.) *State* v. *Morgan*, 86 Conn. App. 196, 213, 860 A.2d 1239 (2004), cert. denied, 273 Conn. 902, 868 A.2d 746 (2005). "[E]vidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of [assault in the first degree]. . . . [A]n instruction on intoxication [therefore] would be warranted [in the present case] if sufficient evidence was introduced to justify it. . . . Because the state has the burden of proving the element of specific intent, the quantum of evidence essential to warrant consideration of the effect of intoxication on the defendant can be no greater than that which might have raised a reasonable doubt as to the existence of the specified mental state." (Citations omitted; internal quotation marks omitted.) *State* v. *Morales*, 71 Conn. App. 790, 815, 804 A.2d 902, cert. denied, 262 Conn. 902, 810 A.2d 270 (2002). "Had evidence been adduced that the defendant was so intoxicated at the time of the commission of [the] offense that he was unable to form a specific intent, the court would have been remiss in failing to instruct the jury on this principle." *State* v. *Clemons*, 168 Conn. 395, 406, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). "The jury is permitted to infer from the fact that an intoxicating substance was ingested that an incapacity to form a specific intent resulted. . . . This does not mean, however, that only the slightest evidence of the possibility of intoxication is sufficient to require a court to give a requested charge on intoxication and specific intent." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 815–16.

Upon a careful review of the record, we conclude that the court did not err by declining the defendant's request to instruct the jury on intoxication. Viewed in the light most favorable to the defendant's request; see *State* v. *Collin*, supra, 154 Conn. 128; the evidence supported a finding that the defendant had ingested Valium, Percocet, and Tramadol on the day prior to the shooting. The evidence further supported a finding that, on the day of the shooting, the defendant ingested four Tramadol pills at some point prior to the shooting, was wearing two fentanyl patches at some point during the day, and ingested five oxycodone-acetaminophen pills at some point during the day, though he tested negative for oxycodone-acetaminophen at the hospital after the shooting.[9] The defendant's testimony did not suggest that he was impaired by the foregoing substances at the time of the shooting, as he cogently testified that he and the victim intended to go shopping on the day of the shooting; he went to the garage to retrieve the rifle; he initially hid the rifle from the victim's plain sight; he intentionally placed the rifle onto his lap; he pursued the victim into their bedroom and bathroom and used his wheelchair to prevent her from barring his entry into both rooms; he pointed the rifle at the victim while in the bathroom with his finger on the trigger; and he bit the victim's pant leg and held onto it with his teeth while she dragged him from the bedroom to the front door. The defendant's clear, coherent, and detailed account of the shooting and its surrounding circumstances "militate[d] against any inference that [he] was intoxicated to the point that [an intoxication] instruction was required." *State* v. *Clemons*, supra, 168 Conn. 406. Furthermore, the evidence did not provide a clear indication of the time at which the substances were introduced into the defendant's system in relation to the time of the shooting. See *State* v. *Morales*, supra, 71 Conn. App. 816 (affirming court's refusal to provide intoxication instruction where quantity of alcohol consumed and time at which alcohol consumption occurred in relation to time of shooting were uncertain).

Last, the defendant failed to introduce expert testimony explaining to the jury the effects of the substances he claims impaired him at the time of the shooting. William R. Schmidt, a physician at Charlotte Hungerford Hospital on the day of the shooting, who examined the defendant after the shooting, testified that Tramadol is a non-narcotic pain medication that, when overdosed, may have overly sedating effects. Neither Schmidt nor any other expert witness, however, testified as to whether the defendant had overdosed on Tramadol or whether Tramadol, either alone or in combination with the other substances, may have impaired him at the time of the shooting. In addition, no expert witness testified as to the effects of fentanyl, oxycodone-acetaminophen, Percocet, or Valium. In contrast to the psychological effects of alcohol or marijuana, we cannot

presume that the jury had common knowledge of the effects of the discrete, complex substances that allegedly impaired the defendant at the time of the shooting. See, e.g., *State* v. *Wade*, 106 Conn. App. 467, 487–88, 942 A.2d 1085 (noting that, unlike impairing effects of alcohol and marijuana, impairing effects of fentanyl and Methadose are not within "common knowledge" of jury), cert. granted on other grounds, 287 Conn. 908, 950 A.2d 1286 (2008) (appeal withdrawn June 12, 2008), aff'd, 297 Conn. 262, 998 A.2d 1114 (2010). Absent expert testimony on the effects of those substances, the jury had no basis upon which to find that the defendant was intoxicated at the time of the shooting.

For the foregoing reasons, we conclude that the court did not err by declining the defendant's request to provide the jury with an instruction on intoxication.

### III

Last, the defendant claims that prosecutorial improprieties occurred when the prosecutor made improper comments during her closing argument and, as a result, he was deprived of his right to a fair trial. He argues, alternatively, that this court should invoke its supervisory authority to reverse his conviction. We disagree.

We begin by setting forth the relevant standard of review and legal principles. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . . An appellate court's determination of whether any improper conduct by the prosecutor violated the defendant's right to a fair trial is predicated on the factors established in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Those factors include the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . . [If] a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . .

"As [our Supreme Court] previously [has] recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . .

When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Claims involving prosecutorial impropriety during the course of closing argument require a court to evaluate a prosecutor's statements not for their possible meaning, but for the manner in which the jury reasonably and likely would have understood them. Because the meaning of words and statements typically is dependent on the context in which they are used, a court must carefully consider a prosecutor's challenged statements by carefully considering their context in the entire trial, including the remainder of the state's closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Washington*, 155 Conn. App. 582, 603–606, 110 A.3d 493 (2015).

A

The first alleged instance of prosecutorial impropriety concerns comments made by the prosecutor during her closing argument regarding a shell casing that the police found in the bathroom where the shooting occurred.

Before proceeding, we first set forth the following additional, relevant facts. During trial, Michael Fitzsimons, a state police officer assigned to investigate the

shooting, testified that the shell casing that the police retrieved from the bathroom was "consistent with" the projectile that was lodged in the victim's leg.[10] He further testified that the shell casing was "consistent with" the shell casings comprising the bullets that the defendant had purchased from Dick's Sporting Goods on the day before the shooting as well as the bullets located inside the magazine that the defendant had attached to the rifle. In addition, he testified that the magazine attached to the rifle was fully loaded when the police retrieved the rifle from the home after the shooting. The defendant testified that he had been unaware that a bullet was in the rifle's chamber at the time of the shooting.

During her closing argument, the prosecutor made the following remarks: "[The victim is upstairs] for, I think [the defendant] said, fifteen minutes. Why didn't [the defendant] take the ammo out of the magazine? Why didn't [the defendant] take the ammo out of the gun? Why didn't [the defendant] check the chamber? [The defendant hasn't] used the gun for years. [The defendant] know[s] how to handle guns. [The defendant] didn't—[the defendant] didn't know there was a round in the chamber? *The casing on the floor matches the ammunition that he purchased from Dick's.* Of course, he had that. He loaded the gun for Lenny [Morey]. *Of course, he put a round in that chamber.*" (Emphasis added.) The defendant did not object to the foregoing emphasized comments during trial.

The defendant asserts that the statements emphasized in the preceding excerpt were improper because they mischaracterized the evidence. He claims that the prosecutor's statement that the shell casing "matche[d]" the shell casings of the bullets he purchased from Dick's Sporting Goods was incongruent with Fitzsimons' testimony that the shell casing was "consistent with" the shell casings of the bullets the defendant had purchased. The defendant interprets Fitzsimons' testimony as meaning that the shell casing found in the bathroom merely resembled the shell casings of the bullets purchased from Dick's Sporting Goods, not that it necessarily came from one of the bullets that he had purchased. According to the defendant, the prosecutor's comment that the shell casing "matche[d]" the shell casings of the ammunition he purchased from Dick's Sporting Goods, coupled with her subsequent comment that "[o]f course, [the defendant] put a round in that chamber," caused him harm because it invited the jury to infer that he had chambered one of the bullets that he purchased from Dick's Sporting Goods, and, thus, implicated the issue of whether he had intended to shoot the victim.

In response, the state argues that the prosecutor's statements were fairly based on Fitzsimons' testimony that the shell casing was "consistent with" the ammunition the defendant purchased at Dick's Sporting Goods.

In this regard, the state suggests that the word "matche[d]" may be interpreted as being synonymous with the phrase "consistent with."

We agree with the state that the prosecutor's comments were not improper. According to the Merriam-Webster's Collegiate Dictionary (11th Ed. 2003), "match," when used as a verb, may be defined as "to be the counterpart of . . . to compare favorably with . . . to harmonize with," while "consistent," when paired with the word "with," may be defined as "marked by agreement . . . compatible . . . ." Both the word "matched" and the phrase "consistent with" could connote either a precise identity or a general similarity. Consequently, the prosecutor's use of the word "matche[d]" did not conflict with Fitzsimons' use of the phrase "consistent with." Furthermore, the other evidence introduced at trial, including the timing of the purchase and the caliber of the bullets, was sufficient to support a finding that the bullet shot from the rifle that struck the victim was one of the bullets that the defendant purchased from Dick's Sporting Goods.[11] For the foregoing reasons, we conclude that the prosecutor's comments were not improper.

B

The second alleged instance of prosecutorial impropriety concerns a comment made by the prosecutor during her closing argument regarding statements the defendant allegedly made to doctors at Charlotte Hungerford Hospital after the shooting.

Before proceeding, we first set forth the following additional, relevant facts. During trial, the state introduced as an exhibit a hospital report created by Tieman, a nurse, on the night of the shooting that provided, inter alia, a list of the medications that the defendant had been taking and a physical assessment of the defendant. In addition, the report contained a section that detailed the events that had transpired prior to the defendant's arrival at the hospital. The report provided, in relevant part: "[Defendant] brought to [hospital] for evaluation after admittedly shooting wife earlier today. . . . [Defendant] states he has evidence that wife was having an affair . . . . [Defendant states] 'I am so upset, how can you have a marriage when you can't trust someone.' [Defendant] states he had a loaded .22 caliber gun and shot [the victim] in the leg. [Defendant] states 'I could have killed her, I am military trained, but I didn't, I don't want her dead.' . . . [Defendant] stated 'I am so sorry she got shot, I don't want to hurt her anymore . . . .' "

In addition, the defendant introduced as an exhibit a hospital report containing a psychiatric assessment of the defendant after the shooting. The report contained a clinical summary section that provided in relevant part: "[Defendant] . . . under arrest after shooting his wife

in the leg today. [Defendant] depressed since finding out his wife is having an affair [with] a man he hired to do his lawn."

During her closing argument, the prosecutor made the following remarks: "[The defendant] intended to [shoot the victim]. *He told the doctors he intended to do it.* He went out and bought the ammunition the day before. He hid the gun. He told [Morey] he was going to shoot him and [the victim] if he caught them at it again, and he did. Maybe he thought he was going to shoot [Morey] first, but he shot [the victim] first." (Emphasis added.) The defendant did not object to the foregoing emphasized comment during trial.

### 1

The defendant asserts that the prosecutor's statement that the defendant "told the doctors he intended to do it" was improper because it mischaracterized the evidence. He contends that the hospital reports do not indicate that he told the doctors or other medical providers that he intended to shoot the victim, but that he had shot her without any admission as to his intent. In response, the state argues that the jury could have inferred from the defendant's statements in the reports that he intended to shoot the victim out of anger when he discovered that she was having an affair.

We agree with the defendant that the prosecutor's comment was improper. Our review of the record does not reveal any evidence, or any fair inferences to be drawn from the evidence, that the defendant stated to any medical provider that he intended to shoot the victim. Tieman's report and the psychiatric report in evidence support a finding that the defendant admitted to shooting the victim, but they do not support a finding that he stated any *intention* to shoot her. Furthermore, there was no testimony elicited at trial suggesting that the defendant had told any medical provider that he intended to shoot the victim. Consequently, we conclude that the prosecutor's comment improperly suggested facts that were not in the evidence. See, e.g., *State* v. *Miller*, 120 Conn. App. 133, 146, 990 A.2d 916 (statement made during closing argument referring to facts not in record constituted prosecutorial impropriety), cert. denied, 297 Conn. 902, 994 A.2d 1288 (2010).

### 2

Although we determine that the prosecutor's comment was improper, we conclude that the improper comment did not deprive the defendant of his right to a fair trial. We consider the following *Williams* factors to guide our analysis: (1) the extent to which the comment was invited by the defendant's conduct or argument; (2) the severity of the comment; (3) the frequency of the comment; (4) the centrality of the comment to the critical issues of the case; (5) the strength of the curative measures adopted by the court; and (6) the

strength of the state's case. See *State* v. *Washington*, supra, 155 Conn. App. 604.

First, we examine the extent to which the comment was invited by the defendant's conduct or argument. Here, our review of the record does not reveal any indication that the defendant's conduct or argument prompted the state to make the comment.

Second, we examine the severity of the comment. "In determining whether prosecutorial impropriety is severe, we consider whether defense counsel objected to the improper remarks, requested curative instructions, or moved for a mistrial. . . . We also consider whether the impropriety was blatantly egregious or inexcusable." (Citation omitted; internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 59, 100 A.3d 779 (2014). Here, the defendant's failure to object to the comment during trial "demonstrates that [the defendant] presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Jordan*, 117 Conn. App. 160, 168, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009); see *State* v. *Grant*, 154 Conn. App. 293, 328, 112 A.3d 175 (2014) (lack of severity evident on basis of defendant's failure to object to impropriety), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015); see also *State* v. *Chase*, 154 Conn. App. 337, 352, 107 A.3d 460 (2014) (same), cert. denied, 315 Conn. 925, 109 A.3d 922 (2015).

Additionally, the prosecutor only made the comment one time during her closing argument, mitigating its severity. See *State* v. *Chase*, supra, 154 Conn. App. 351–52 (impropriety not severe when it occurred twice during closing argument and was not recurring theme throughout trial); *State* v. *Crump*, 145 Conn. App. 749, 762, 75 A.3d 758 (one instance of impropriety that defendant did not object to was neither frequent nor severe), cert. denied, 310 Conn. 947, 80 A.3d 906 (2013); *State* v. *Johnson*, 107 Conn. App. 188, 203, 944 A.2d 416 (claimed improprieties not severe because "they constituted a very small portion of the state's final argument"), cert. denied, 288 Conn. 905, 953 A.2d 650 (2008).

Our analysis is further guided by our Supreme Court's application of the severity prong in *State* v. *Thompson*, 266 Conn. 440, 479–80, 832 A.2d 626 (2003).[12] See *State* v. *Miller*, supra, 120 Conn. App. 147; see also *State* v. *Albino*, 312 Conn. 763, 792 n.12, 97 A.3d 478 (2014). Here, by once commenting that the defendant told the doctors at the hospital that he intended to shoot the victim, the prosecutor "did not engage in repeated *Thompson* like patterns of bitter invective." *State* v. *Miller*, supra, 147.

Guided by the foregoing principles, we conclude that the prosecutor's comment was not severe. See *State* v.

*John B.*, 102 Conn. App. 453, 466–68, 925 A.2d 1235 (impropriety not severe despite being based on facts not in evidence), cert. denied, 284 Conn. 906, 931 A.2d 267 (2007); cf. *State* v. *Maguire*, 310 Conn. 535, 561, 78 A.3d 828 (2013) (improprieties severe where prosecutor questioned veracity of defense counsel and mischaracterized defendant's defense theory); *State* v. *A. M.*, 156 Conn. App. 138, 150–51, 111 A.3d 974 (2015) (impropriety severe where prosecutor asked jury to examine defendant's credibility on the basis of defendant's failure to testify at trial); *State* v. *Felix R.*, 147 Conn. App. 206, 220–23, 228, 83 A.3d 619 (2013) (improprieties severe where prosecutor appealed to emotions of jury by commenting that complainant in sexual assault had to be examined by doctors, face the defendant and a jury at the defendant's trial, and testify about personal matters), cert. granted, 311 Conn. 915, 84 A.3d 883 (2014); *State* v. *Martinez*, 143 Conn. App. 541, 580, 69 A.3d 975 (two improper statements "compounded" severity, particularly where prosecutor made brief closing argument and had limited amount of evidence to highlight in closing argument), cert. granted, 310 Conn. 909, 76 A.3d 625 (2013); *State* v. *McLaren*, 127 Conn. App. 70, 85, 15 A.3d 183 (2011) (improprieties severe where prosecutor revealed to jury inadmissible evidence that amounted to confession by defendant).

Third, we examine the frequency of the comment. Here, the comment was infrequent, as the prosecutor made the comment only once during her closing argument. See *State* v. *Grant*, supra, 154 Conn. App. 327–28 (improper comment made once); *State* v. *Crump*, supra, 145 Conn. App. 762 (same); *State* v. *Miller*, supra, 120 Conn. App. 148 (same); see *State* v. *Aviles*, 154 Conn. App. 470, 487, 106 A.3d 309 (2014) (improper comment made twice), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015); *State* v. *Chase*, supra, 154 Conn. App. 351 (same); cf. *State* v. *Thompson*, 146 Conn. App. 249, 271–72, 76 A.3d 273 (improper comment made seven times), cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013); *State* v. *Jordan*, supra, 117 Conn. App. 169 (impropriety repeated fourteen times).

Fourth, we examine the centrality of the comment to the issue of the defendant's intent to shoot the victim, which was a critical issue in the case because it is an element of assault in the first degree pursuant to § 53a-59 (a) (1) and (5). See *State* v. *Jordan*, supra, 117 Conn. App. 169 ("[i]t is a well established principle that the elements of a crime are critical issues in a state's case" [internal quotation marks omitted]). Here, the comment was central to the critical issue of whether the defendant intended to shoot the victim.

Fifth, we examine the curative measures adopted by the court in response to the comment. Here, the defendant did not object to the comment during the prosecutor's closing argument, and the court did not

provide any curative instructions in regard to the comment. The court, however, provided the jury with the following general instruction: "Certain things are not evidence, and you may not consider them in deciding what the facts are. These include: (1) arguments and statements made by the lawyers. [The lawyers] are not witnesses. What they have said in their closing arguments is intended to help you interpret the evidence, but it is not evidence." "In the absence of a showing that the jury failed or declined to follow the court's [general] instructions, we presume that it heeded them. . . . There is no suggestion in the present case that the jury did not follow the court's general instructions." (Citation omitted; internal quotation marks omitted.) *State* v. *Miller*, supra, 120 Conn. App. 148–49; see also *State* v. *Albino*, supra, 312 Conn. 792 (where no objection made and no curative instructions given, court's general instructions likely mitigated effect of some improprieties).

Last, we review the strength of the state's case. Here, it is undisputed that the defendant shot the victim. The defendant was distraught by the victim's admitted infidelity and did not believe that she had ended her relationship with Morey. The defendant purchased ammunition and two rifle magazines, which he filled with the ammunition, attached one of the magazines to his rifle, pursued the fleeing victim into their bathroom and pointed the loaded rifle at her with his finger on the trigger and the safety lock turned off.[13] He threatened to shoot her again after having initially shot her in the leg. He did not voluntarily drop the rifle after shooting the victim; instead, the victim had to forcibly disarm him. After arriving at the hospital following the shooting, he told the medical providers that he had loaded the rifle and shot the victim, and that, with his military background, he could have killed her but did not want to. He further stated that he "[didn't] want to hurt [the victim] anymore." "Our Supreme Court has never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Jordan*, supra, 117 Conn. App. 170. Absent the prosecutor's comment, there was ample evidence for the jury to conclude that the defendant intended to shoot the victim and, therefore, the state's case was strong.

On the basis of our assessment of the foregoing factors, we are not persuaded that "there is a reasonable likelihood that the jury's verdict would have been different absent the . . . [prosecutor's] impropriet[y]." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 706, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014). Therefore, we conclude that the defendant was not deprived of his right to a fair trial by the prosecutor's improper comment.

Alternatively, the defendant asks us to invoke our supervisory authority to "deter and restrain serious prosecutorial misconduct of the kind that occurred here." (Internal quotation marks omitted.) We are not persuaded.[14]

The following additional facts are relevant here. At trial, the defendant attempted to introduce an unredacted version of the psychiatric report that was in evidence. The unredacted report contained statements made by him suggesting that he did not intend to shoot the victim. The state objected to the introduction of the unredacted report, arguing that it contained self-serving statements made by the defendant. After argument, the court sustained the state's objection, concluding that any of the defendant's statements contained in the unredacted report suggesting that he did not intend to shoot the victim were highly prejudicial and self-serving. The court permitted the defendant to introduce a redacted version of the psychiatric report into evidence that excluded, inter alia, statements made by him concerning his lack of intent to shoot the victim.

The defendant asserts that the prosecutor's comment concerning his alleged statement to the doctors, that he intended to shoot the victim, was egregiously improper because the unredacted report, which the prosecutor had read, contained statements the defendant had made indicating that he did not intend to shoot the victim. According to the defendant, not only did the prosecutor state a fact not in the evidence, but her comment expressly contradicted statements he had made, as contained in the unredacted report the jury did not have an opportunity to view. The defendant claims that such "serious prosecutorial misconduct" warrants the exercise of our supervisory authority to reverse his conviction. We disagree.

"[W]hen prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . [W]e pay particular attention to [whether] the prosecutor knew or should have known that the conduct was improper and [whether the impropriety] was part of a pattern of similar misconduct in other cases. We exercise our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial. We do so in order to send a strong message that such conduct will not be tolerated." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 48–49, 66 A.3d 520 (2013).

This case does not warrant the rare exercise of our supervisory authority. The prosecutor made the improper comment only once during her closing argument, the comment was not in direct conflict with any specific court ruling; see *State* v. *David O.*, 104 Conn. App. 722, 729, 937 A.2d 56 (2007), cert. denied, 285 Conn. 915, 943 A.2d 473 (2008); and the evidence in the record does not suggest that she deliberately attempted to mislead the jury and taint the trial. Furthermore, there is no evidence in the record indicating that there is a "pattern of similar misconduct in other cases." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 143 Conn. App. 48. Therefore, we conclude that the use of our supervisory authority in this case is unwarranted.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The jury also found the defendant subject to an enhanced sentence under General Statutes § 53-202k.

[2] The victim testified that she owned the second cell phone because the defendant had installed a global positioning system device on her primary cell phone to track her whereabouts.

[3] The defendant testified that he did not know why the safety lock was turned off.

[4] The bullet went through the victim's right leg and was lodged in her left leg.

[5] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[6] The following exchange between the court and defense counsel occurred during argument on the motion:

"The Court: How is pain—how is pain relevant to the case?

"[Defense Counsel]: Pain can make people—pain can make people act otherwise.

"The Court: Shouldn't you have explored that ahead of time, that your defense was going to be some type of overprescription, to the possibility that he was in extreme pain, and wouldn't that be something that would be reasonable to foresee as defense counsel in this case?

"[Defense Counsel]: Well, we did foresee it.

"The Court: Didn't you have access to the report that indicated by the doctor who testified yesterday, he wasn't in pain? So, it's not even a matter of me being concerned with the late disclosure. I don't know the relevance of the issue of pain.

"You're not dealing with extreme emotional distress, it's not applicable to this type of charge. You can't now claim . . . not guilty by reason of mental disease or defect. You know you can't proceed that way. The state had the right to be notified of that. The only avenue that I think that you're pursuing is some type of intoxication, either by drugs and/or alcohol that negates specific intent.

"[Defense Counsel]: Right, lack of intent.

"The Court: Pain doesn't—pain—general description of his pain by a doctor who didn't see him on any of the dates in question, how is it relevant?

"[Defense Counsel]: Well, other than what I've already argued.

"The Court: All right.

"[Defense Counsel]: That—

"The Court: The testimony is excluded.

"The Clerk: The motion is denied?

"The Court: Denied."

[7] As a result of our conclusion that Levi's proffered testimony was not relevant, we need not reach the issue of whether the defendant was harmed by its exclusion.

[8] Furthermore, even if Levi's proffered testimony was relevant to the issue of intoxication, the record reveals that the defendant did not seek to introduce Levi's testimony as evidence that the defendant was intoxicated at the time of the shooting. The defendant did not cite the issue of intoxication as a reason for proffering Levi's testimony; instead, the defendant's proffered Levi's testimony to rebut Tieman's testimony and impeach her credibility. See, e.g., *State* v. *Adorno*, 121 Conn. App. 534, 548 n.4, 996 A.2d 746 ("[o]rdinarily, we will not consider a theory of relevance that was not raised before the trial court"), cert. denied, 297 Conn. 929, 998 A.2d 1196 (2010).

[9] In addition, the evidence presented at trial supported a finding that the defendant ingested Valium and smoked marijuana *after* the shooting occurred.

[10] According to Fitzsimons' testimony, a bullet is comprised of a shell casing and a projectile.

[11] The defendant emphasizes that the magazine attached to the rifle was fully loaded when found by the police after the shooting, suggesting that none of the bullets the defendant loaded into the magazine entered the chamber of the rifle. There was testimony elicited at trial, however, indicating that it was possible to insert a bullet manually into the chamber of the rifle, rather than through the magazine. Therefore, a fair inference may have been drawn from the evidence that the defendant manually loaded a bullet that he purchased from Dick's Sporting Goods into the chamber of the rifle.

[12] "In *Thompson*, a murder prosecution, our Supreme Court reviewed and found improper the prosecutor's repeatedly calling the defendant a killer . . . calling the testimony of the defendant's two principal witnesses reprehensible, saying that they were lying and lacked both moral fortitude and conscience, lived in a twisted world, were not stand-up enough guy[s] and let misguided loyalty to a friend influence their testimony, and that by doing so, they had reserved a place in hell for themselves . . . and they were truthful in their earlier, recanted pretrial statements and that to believe their trial testimony, jurors had to believe that the state's witnesses had lied, and suggesting to the jury that the witnesses would be arrested in connection with the homicide. . . . Our Supreme Court in *Thompson* also concluded that the prosecutor improperly importuned the jury to give the victim's family justice by convicting the defendant . . . and, finally, that he improperly urged the jury to use impeachment evidence against a third defense witness substantively. . . . Nonetheless, our Supreme Court held that this misconduct was not, for the most part, severe." (Internal quotation marks omitted.) *State* v. *Miller*, supra, 120 Conn. App. 147 n.12.

[13] The defendant testified at trial: "[Y]ou don't put your finger [on the trigger] or else you're going to shoot someone."

[14] The defendant appears to claim that we should invoke our supervisory authority to reverse his conviction on the basis of all of the prosecutor's comments that he is challenging on appeal. On the basis of our conclusion, however, that the prosecutor's comments regarding the shell casing found in the bathroom were not improper, we solely address whether we should invoke our supervisory authority to address the prosecutor's improper comment regarding the defendant's alleged statement to the doctors at the hospital that he intended to shoot the victim.